IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| David Nellum, | Case No. 3:13 CV 1392 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER GRANTING |
| -vs- | <u>SUMMARY JUDGMENT</u> |
| Linda Braden, | JUDGE JACK ZOUHARY |
| Defendant. | |

### INTRODUCTION

In September 2011, prison inmate Plaintiff David Nellum ("Nellum") slit his left wrist with a razor blade during a psychotic episode. At the time, Nellum was housed at the Toledo Correctional Institution ("ToCI"), where Defendant Linda Braden ("Braden") was a nurse. Nellum alleges Braden's deliberate indifference to his serious mental condition led to his injuries. Braden now moves for summary judgment, arguing Nellum has not produced evidence that Braden knew of and disregarded a serious risk of harm to Nellum. Viewing record facts in Nellum's favor, Braden is entitled to summary judgment.

### BACKGROUND

**Nellum's Mental Illness and Treatment at SOCF**

Nellum suffers from schizoaffective disorder, bipolar type (Doc. 32-1 at ¶ 4). He experiences visual and auditory hallucinations during psychotic episodes. His auditory hallucinations often take the form of commands: "[V]oices tell me that I am a bad person and that I should die. They tell me to hurt myself and other people. Because of the voices, I can get really irritable and jumpy" (*id.* at

¶5). Nellum attempted suicide at least twice in his adult life (*id*. at ¶ 3). He takes medication to address symptoms of his disorder. "If I am on medication for my illness, I can ignore the voices" (*id*. at ¶ 6).

The Ohio Department of Rehabilitation and Correction ("ODRC") operates Residential Treatment Units ("RTU") at certain prisons, providing "more intensive mental health . . . care . . . than can be provided in a general population environment" (Doc. 32-6 at 2). ODRC reserves RTU space for mentally ill inmates who (1) cannot be stabilized under the mental health services available to general population inmates, (2) are a harm to themselves, or (3) need "crisis level" care (*id*. at 2–3).

From 2008 through late March 2011, Nellum lived in an RTU at the Southern Ohio Correctional Facility ("SOCF"). His condition improved. "The voices weren't bothering me much, and I was able to get more privileges" (Doc. 32-1 at ¶¶ 7–8). *See also* Doc. 32-5 at 1–8. SOCF and Nellum then agreed he should be transferred to SOCF general population (Doc. 32-1 at ¶ 8 ; Doc. 32-5 at 8; Doc. 32-8 at 3). Later, on April 5, 2011, ODRC transferred Nellum from SOCF to a ToCI general population unit -- ToCI had no RTU (Doc. 35, Braden Dep. at 60).

**The ToCI Mental Healthcare Team**

At the time of his transfer to ToCI, the institution's healthcare staff was divided into three units: (1) mental health staff, (2) medical department, and (3) prison pharmacy. Braden was a member of the mental health staff, alongside (among others) another registered nurse and an off-site psychiatrist, Dr. Durner (*id*. at 28–29), who would evaluate patients remotely via "telemed," a video conference service (*id*. at 40–41). Braden led anger management training, oriented new patients on mental health services, and processed medication orders.

As she described the latter task, "I would be given the charts that had the new medication orders in them, I would take the medication order out, photocopy it, I would then take the orders over

to the medical department, I would put them on [the Medication Administration Record, or MAR], I would then fax everything to the pharmacy and then I would bring my photocopies [and originals] back with me," place the copies and originals in the medical file, and indicate she had completed medication processing (*id*. at 33–34). Braden could not prescribe or administer medication or otherwise alter how an inmate received medication (*id*. at 38–39, 44).

Nellum was a "voluntary patient" (*id*. at 52), meaning he would receive his psychiatric medication by visiting "pill call" (*id*. at 54). Medical department nurses ran pill call, tracking Nellum's compliance with doctors' orders using the MAR (*id*. at 44). The MAR, essentially a spreadsheet, lists Nellum's prescribed medication in the leftmost column, followed by numbered columns corresponding to each day in a month.

A medical department nurse would hand Nellum (for example) his daily Risperdal. If Nellum took the Risperdal, the nurse would note that fact by initialing the MAR. If Nellum refused a particular medication or did not show to pill call, the medical department nurse would record the medication refusal or "no show" by entering standard codes in the relevant MAR box.

Dr. Durner would not provide a ToCI inmate "refills" on psychiatric medicine (*id*. at 65–66). Rather, he would prescribe medication for a definite time. When that time lapsed, the inmate no longer received medication at pill call. He would have to contact mental health staff to request a new prescription (*id*. at 48 ("The doctor would only order [psychiatric medicine] for so many days and that's it.")). The inmate may "drop by" the mental health unit, or send the mental health staff a "kite" (an intrafacility inmate letter) (*id*. at 37). It is his "responsibility to let a staff member know that [his medication is or would be unavailable] so that we could get things moving again" (*id*. at 50).

Generally, Dr. Durner would order medication during a telemed attended by the inmate and Braden or another mental health nurse. To prevent "gaps" in medication, mental health staff would

3

"have the patient get a doctor's appointment around th[e medication's] stop date" (*id*. at 49). Braden would note the need for a follow-up telemed in the patient's medical file, and Social Worker June Brewer would then schedule the follow-up telemed (*id*. at 88, 117–119; Doc. 27-7 at ¶ 4).

In addition to the MAR, medical staff would track a patient's treatment and health condition using "Interdisciplinary Progress Notes" ("IPN"), a standard form. A copy of each IPN entry remained in the inmate's medical file, providing a record of staff interactions with the inmate. "[I]f I had some sort of interaction that was, what I would say noteworthy with a patient, then I would document it" in an IPN (Braden Dep. at 39). If requested, Braden would "occasionally" read IPN entries made by other medical staff (*id*. at 40–41).

### The First Lapse in Nellum's Medication

On April 30, 2011, Nellum sent a kite to ToCI staff, informing he was not receiving certain medication. The kite's legible portion reads "I was taken off my medication that I had taken [illegible] for years" (Doc. 32-10 at 2). Nellum explains that he "started to feel[] anxious and jumpy and hear[] voices" (Doc. 32-1 at ¶ 10). Braden responded on May 3, informing Nellum he had been scheduled to see the psychiatrist, who also had been "notified about your medications" (Doc. 32-10 at 2).

The next day, therapist Brenda Kozie-Peak, emailed (among others) Braden, relaying Nellum's claims that he had not received Risperdal, Cogentin, or Lithium since his March 23 discharge from the SOCF RTU (Doc. 32-9 at 1–2). *But see* Doc. 32-7 at 1–2 (April 2011 SOCF and ToCI MARs, reflecting Nellum's psychiatric medicine was available through April 19, and that in fact Nellum received his medication at pill call during much of that period except for a handful of no-shows).

4

On May 4, Dr. Durner placed, through Braden, a telephone order for the lapsed medications (Doc. 32-11 at 1). Nellum's May 2011 MAR shows his medication was available on May 5. He did not show to pill call for five of the next seven days (Doc. 39-5 at 1). On May 13, Dr. Durner saw Nellum, noting in an IPN that Nellum had been "off meds for 2 weeks," that his auditory hallucinations were controllable, but that he felt "anxiety in [his] new prison" (Doc. 32-5 at 11). Nellum "[f]ear[ed] some one is going to get me"; Dr. Durner modified and extended Nellum's psychiatric medication (*id.*).

**Nellum and Braden's July and August Interactions**

Prior to Nellum's September suicide attempt, the record reveals several interactions between Braden and Nellum. On June 9, Braden wrote an IPN entry noting she "[a]dvised [Nellum] to seek medical help if having racing heart of palpitations immediately [sic]" (Doc. 27-5 a 1). The next day, Braden provided Nellum "Medication teaching." They discussed certain medications that affected his restlessness and may have contributed to his racing heart (*id.*; Doc. 39-13 at 1 (form listing the "antidyskinetics" (not including Risperdal, Lactimal, or Lithium) Braden and Nellum discussed at the June 2011 session)). Braden writes that she told Nellum to "contact [the mental health staff] as needed" (Doc. 27-5 at 1).

Braden attended a July 25 telemed, at which Dr. Durner examined Nellum (Doc. 39-7 at 1). Dr. Durner extended Nellum's Risperdal medication for thirty days at a lower dosage, discontinued his Lithium, Cogentin, and Vistaril, and substituted in place of Lithium a thirty-day Lactimal order -- Nellum believed the Lithium contributed to his blood pressure issues (*id.* at 1–2; Doc. 27-2 at ¶ 6). Rispderal "is an antipsychotic medication that works by changing the effects of chemicals in the brain. It is used to treat schizophrenia and the symptoms of bipolar disorder," while Lactimal is a "mood stabilizer . . . used to delay mood episodes in adults with bipolar disorder" (Doc. 27-2 at ¶¶ 8–9).

5

According to Nellum's August 2011 MAR, his Risperdal and Lactimal would expire on August 23 (meaning, without renewal, the medication would not be available at pill call beginning August 24 (*see* Doc. 32-7 at 5)). Nellum claims he told Dr. Durner "I wanted to change my medications, but I did not tell them that I wanted the medication stopped"; "Durner told Nurse Braden to schedule a follow-up appointment for 30 days later" (Doc. 32-1 at ¶ 12).

The same day, Nellum saw therapist Kozie-Peak for "TX Plan & MHC." Kozie-Peak wrote that Nellum said he had met with Dr. Durner and "RX issues were successfully addressed" (Doc. 27-5 at 1). Nellum stated his racing thoughts were "getting out of hand," but admitted he had not been taking medication as prescribed and denied any intent to harm himself. Kozie-Peak advised Nellum to "kite for services if needed between sched[uled] MHC contacts" (*id*. at 2).

Nellum's poor compliance with his medication regime continued throughout August 2011 (Doc. 39-8 at 1 (noting Nellum was a no-show to pill call for his Risperdal and Lactimal on August 2, 5, 8, 11–13, 19, 21, and 23)). He claims he was told at the August 22 pill call "that my medications were being discontinued." He then "saw Nurse Braden in front of the infirmary" on August 23 and "told her that I was out of medication" (Doc. 32-1 at ¶¶ 13–14). Braden said "she would look into it" (*id*. at ¶ 13). August 29 came and went without Nellum receiving his medication -- he "told [his] mental liaison about it. She told me that she would contact Nurse Braden about it" (*id*. at ¶ 15). *See also* Doc. 27-5 at 2 (Kozie-Peak August 29 IPN entry: "Inmate walk-in. RX has run out. Email sent to Nurse Braden").

By an August 31 IPN entry authored by Braden, Dr. Durner renewed Nellum's Lactimal and noted he needed to be seen "ASAP" by Dr. Durner (Doc. 27-6 at 1; Doc. 27-2 at ¶¶ 11–12). Sometime between August 31 and September 2, Braden visited the medical department and had "a medical nurse . . . open up the drawer where the medications were kept so that I could see if there were medications

6

there . . . . I don't know them all by name, but I remember seeing the medications that were on the MAR, they were in the drawer" (Braden Dep. at 58–59).

### Nellum and Braden's September 2011 Interaction

"On September 2, I still had not received my medications. I was getting really anxious and was hearing voices telling me to harm myself. I went to the infirmary to ask for my medications again" (Doc. 32-1 at ¶ 16). Nellum was upset and confused about why he hadn't received his medication. "Instead of helping me get my medication, Nurse Braden told me, 'Get out of my face'" (*id*. at ¶ 17).

By contrast, Braden claims she spoke softly to Nellum during the September 2 confrontation. She "was trying to keep the conversation confidential between the two of us because we were in the infirmary in an exam room with the door open and there were other people in the area" (Braden Dep. at 60). She states she told Nellum about seeing his Lactimal at the Medical Department (Doc. 37-1 at ¶¶ 8–9). Two corrections officers heard Nellum yelling at Braden (*see* Braden Dep. at 60). Braden records in a September 2 IPN entry "Mr. Nellum informed by CO's to lower voice and calm self. Mr. Nellum unable to lower voice or stop yelling. Left room when asked to" (Doc. 27-8). After Nellum left the infirmary Braden had no further interaction with Nellum (Doc. 37-1 at ¶ 14).

### Nellum's September 2011 Suicide Attempts

Distraught, Nellum "could not handle the stress any more. I had nowhere else to turn for help. The voices were telling me to hurt myself, and I did." Using a razor blade, Nellum slashed his left wrist "over and over again," yielding five lacerations that required 21 sutures (Doc. 32-1 at ¶ 18; Doc. 32-5 at 16; Doc. 32-12 at 1). Prison staff transported Nellum to St. Vincent Hospital's Emergency Room (Doc. 27-4 at 3). Over the next several days, Nellum was unstable. Once back at ToCI, Nellum tore out the sutures that held his wounds closed (Doc. 32-5 at 19). Prison staff sent Nellum back to St. Vincent's, where his wounds were stapled shut and his arm wrapped in gauze. On the ride back

7

to ToCI from this second hospital visit, Nellum removed the staples from his arm and attempted to strangle himself with the gauze (*id.* at 19, 25; Doc. 32-12 at 4–5). At the prison, Nellum attempted to overdose on medication he had been allowed to keep in his cell (Doc. 32-5 at 22). Prison staff induced vomiting and placed Nellum on suicide watch.

Nellum has since been transferred to Warren Correctional Institution.

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." *Id.* When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute. Rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The doctrine of qualified immunity shields from civil liability government officials who perform discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks omitted). When raised by way of summary judgment, qualified immunity must be denied when: (1) facts taken in the light most favorable to the plaintiff show a constitutional violation, and (2) the relevant constitutional right was "clearly established" at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). When evaluating established law, this Court first looks to the decisions of the U.S. Supreme Court, then to decisions of the Sixth Circuit, then to decisions of district courts within this

8

Circuit, and, finally, to decisions of courts in other circuits. *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991).

## DISCUSSION

### Eighth Amendment Standard

"The Eighth Amendment forbids prison officials from unnecessarily and wantonly inflicting pain on an inmate by acting with deliberate indifference toward the inmate's serious medical needs." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (quotation marks omitted). Where the prison official's alleged deliberate indifference resulted in an attempted suicide, the plaintiff must show "'a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the [prisoner's] serious medical needs.'" *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (quoting *Barber v. City of Salem*, 953 F.2d 232, 239–40 (6th Cir. 1992)). An Eighth Amendment claim contains objective and subjective elements.

### *Nellum Shows a Triable Issue on the Existence of a Serious Medical Need*

First, "Plaintiff must [produce] facts which . . . establish the existence of a sufficiently serious medical need. Seriousness is measured objectively, in response to contemporary standards of decency." *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012) (quotation marks and internal citations omitted). Nellum has produced sufficient evidence to show his mental condition is a serious medical need: he has been diagnosed by a medical professional as having schizoaffective disorder, has long received psychiatric medicine to address that illness, and previously attempted suicide or acted violently during psychotic episodes.

During the month leading up to his suicide attempt, Nellum failed to take a substantial portion of his daily dosage of psychiatric medication, which had to "build up [over multiple dosage days] to a certain level to be effective" (Braden Dep. at 62). By frequently missing pill call when he had medication available, and by having no medication available during ten days in late August 2011 that preceded his suicide attempt, Nellum has shown "a question of fact . . . as to whether there was a recognizable significant likelihood of [his] attempting suicide." *Perez v. Oakland County*, 466 F.3d 416, 424–425 (6th Cir. 2006). *See also Cooper v. County of Washtenaw*, 222 F. App'x 459, 465 (6th Cir. 2007) ("[I]t is beyond dispute that suicidal tendencies meet this objective component."); *Linden v. Washtenaw County*, 167 F. App'x 410, 416 (6th Cir. 2006) (same).

### *Nellum Fails to Show a Triable Issue that Braden was Subjectively Aware of his Suicide Risk*

"The subjective element requires an inmate to show that prison officials have a sufficiently culpable state of mind in denying medical care." *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010) (quotation marks omitted). The "plaintiff must show that the official: (1) subjectively knew of a risk to the inmate's health, (2) drew the inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk." *Id*. "Although the plaintiff bears the onerous burden of proving the official's subjective knowledge, this element is subject to proof by the usual ways," including by inferences "from circumstantial evidence that a prison official had the requisite knowledge." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (quotation marks omitted). Nellum must produce "evidence to support his claim that [Braden] actually knew that [he] was at risk of committing suicide." *Gray*, 399 F.3d at 616.

Braden claims she had no knowledge that Nellum's medication lapsed on August 24 until, at the earliest, August 29. She argues "Plaintiff's allegation that he notified [me] on August 23, 2011 that he 'needed his medication' is contrary to the medical evidence," which shows his medication was

10

available on August 23 but that on that day he was a no show "to either receive them or to notify Nurse Braden" of his supposed medication lapse (Doc. 37 at 4).

Nellum claims that he spoke with Braden "in front of the infirmary" (Doc. 32-1 at ¶ 14); he does *not* claim that he attended pill call. Thus, there is a factual issue as to whether Braden knew on August 23 that Nellum's psychiatric medication would lapse on August 24. Record evidence reveals that on August 29, Kozie-Peak told Braden that Nellum's psychiatric medication had lapsed, and that Braden did not contact Dr. Durner until August 31 for a renewal. Further, Nellum cannot base Braden's liability on the failure to schedule a follow-up to the July 25 telemed. Record evidence shows that Braden fulfilled her limited role in telemed scheduling. She noted the need for a follow-up in an IPN, and it was then June Brewer's obligation to schedule the follow-up appointment. Braden can only be held liable for her actions, not the errors (if any) of other prison staff. *See Gibson v. Matthews,* 926 F.2d 532, 535 (6th Cir. 1991).

But Nellum's claim is not simply that Braden knew Nellum's psychiatric medicine had lapsed and Braden failed to timely contact Dr. Durner to renew the prescription. He must present evidence "that [Braden] knew [the lapse in medication] was excessively risky to [Nellum's] safety." *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999) (en banc). The only risk to which Nellum points is that a lapse in medication would aggravate symptoms of his schizoaffective disorder -- visual and auditory command hallucinations -- and push him to attempt suicide. Therefore, Nellum must produce direct or circumstantial evidence that Braden knew of Nellum's suicide risk. He has not.

***IPN Entries.*** Though Braden testified she only "occasionally" read IPN entries or other portions of the medical file created by other staff (Braden Dep. 39–41), and never testified that she had read other staffs' entries in Nellum's file, this Court assumes Braden was familiar with all portions of Nellum's "medical file." Had she read the medical file, none of that information would inform Braden

11

of Nellum's risk of suicide. Record evidence shows that Nellum's medical file contained only (1) IPN entries, (2) physician orders, (3) monthly MARs, and (4) inmate kites (Doc. 27-13 at 1; Braden Dep. at 37–38). None of the IPNs made part of the summary judgment record show Nellum expressing suicidal thoughts to staff (let alone to Braden). Instead, ToCI mental health staff repeatedly asked Nellum whether he had any intent to injure himself or others. Nellum always answered "no" (*see, e.g.*, Doc. 32-5 at 9–11, 14).

*The MAR.* To the extent the August 2011 MAR would have put Braden on notice that Nellum had missed a substantial portion of his August medication, no evidence suggests Braden would have known of that fact until after the suicide attempt. The record contains only generalized evidence of Braden's use of the August MAR. According to that evidence, Braden would have used the August MAR only before and after medical nursing staff dispensed medication for the month: she noted new prescriptions on the MAR after the July 25 telemed (*see* Braden Dep. at 89–90), and in September would have conducted a MAR audit, calculating by hand the number of days in August Nellum missed pill call or refused medication (*see id.* at 73–74). Even if she had knowledge of Nellum's poor medication compliance, she testified she had no prior knowledge of Nellum's past suicide attempts (*id.* at 57). Nellum did not testify that he told Braden of past attempts or of suicidal thoughts.

*Inmate Kites.* The summary judgment record contains a single inmate kite, written prior to the September 2011 suicide attempt. Nellum sent the kite to mental health staff on April 30, 2011, and Braden responded to Nellum by writing on the same sheet of paper. Nellum's portion of the kite is mostly illegible. However, he does explain that he had been removed from his medications (Doc. 32-10 at 1–2), and defense counsel represents that the kite's illegible portion also notes Nellum's "heightened anxiety" (Doc. 32 at 4). This kite is not direct or circumstantial evidence of Nellum's suicide risk.

***Other Prison Records Not Part of the Medical File.*** Nor is there an indication that Braden had access to (much less read) other records that were prepared by staff at other Ohio prisons and noting Nellum's prior suicide attempts (*see, e.g.*, Doc. 32-2 (mental health evaluations); Doc. 32-4 (August 2006 Richland Correctional Institution suicide watch forms)). When another nurse processed Nellum into ToCI, she noted his past suicide attempts on a "patient transfer summary" (Doc. 32-3 at 3). No evidence suggests that Braden saw, had access to, or knew of this form.

***RTU Placement and Knowledge of Nellum's Symptoms.*** Still, Nellum claims that Braden was aware of a risk for self-harm because she knew Nellum had lived in an RTU, "a placement reserved for seriously mentally ill inmates" (Doc. 32 at 15). Braden does not deny that she knew Nellum had a serious mental illness, and RTU housing is not reserved for only suicidal inmates (Doc. 32-6 at 2–3). Knowledge of RTU placement (without more) does not equate to knowledge of suicide risk.

Nor does Braden deny that she knew of Nellum's "symptoms related to schizoaffective disorder" (Doc. 32 at 15). Nellum simply offers no evidence that persons afflicted with Nellum's form of visual and auditory hallucinations pose a strong likelihood of suicide during periods of decompensation, and that such a likelihood would be evident to a mental health nurse in the absence of other notice that the patient had previously attempted suicide or entertained such thoughts. The evidence offered "hardly creates an inference that [Braden perceived] 'a substantial likelihood, rather than a mere possibility,' that [Nellum] would try to harm himself." *Horn by Parks v. Madison County Fiscal Court*, 22 F.3d 653, 661 (6th Cir. 1994) (quoting *Schmelz v. Monroe County*, 954 F.2d 1540, 1545 (11th Cir. 1992)).

"[D]eliberate indifference is akin to criminal recklessness." *Vadlamudi*, 680 F.3d at 627 (quotation marks omitted). The standard is "not an objective test or [satisfied by the] collective knowledge" of all the prison staff who dealt with Nellum during his incarceration. *Gray*, 399 F.3d at

13

616. A jury could find Braden negligent for allowing eight days to pass before she took action to seek renewal of Nellum's psychiatric medication. But "the standard of care in this area is not negligence." *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006). "An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. But an official's failure to alleviate a significant risk that [the official] should have perceived but did not, while no cause for commendation, cannot under [deliberate indifference caselaw] be condemned as the infliction of punishment." *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994) (internal citations omitted).

## CONCLUSION

Because Nellum points to no genuine disputes of material fact that Braden subjectively knew of and disregarded a serious risk to his health, Braden is entitled to judgment as a matter of law on Nellum's Section 1983 claim. Nellum brings no other claims. Therefore, this case is dismissed.

IT IS SO ORDERED.

                                          s/ *Jack Zouhary*
                                          JACK ZOUHARY
                                          U. S. DISTRICT JUDGE

                                          November 18, 2014